A

Case 3:02-cv-01844-CFD    Document 34-2    Filed 03/11/2004    Page 1 of 20

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| WALTER SCOTT PETERSON,<br>    Plaintiff<br><br>V.<br><br>UNUMPROVIDENT CORPORATION,<br>PROVIDENT LIFE AND ACCIDENT<br>INSURANCE COMPANY, and<br>HILB, ROGAL AND HAMILTON<br>COMPANY,<br>    Defendants | CIVIL ACTION NO. 302CV01844CFD |

DECLARATION OF MARCI K. BROKISH

I Marci K. Brokish, hereby declare:

1. I am an Advanced Senior Paralegal at UnumProvident Corporation in Chattanooga, Tennessee. I make the statements in this declaration based upon my personal knowledge of the facts stated below, and they are all true and correct.

2. I have reviewed the following request:

Request No. 16: From 1999 to the present, produce any documents, including any affidavits, deposition transcripts or trial transcripts of any person including, without limitation, all claims handlers, health care providers or third parties, employed, retained, or used by you, who discussed, investigated, reviewed, made comments, suggestions, recommendations or decisions concerning applications for disability

benefits that concern, refer or relate to: (a) any allegation that Provident pressured its employees and/or doctors to deny or terminate claims for disability benefits; (b) any allegation that Provident set targets, goals or projections regarding the rate or number of denial of claims for disability benefits; (c) any allegation that Provident provides financial incentives to any person to deny or terminate claims for disability benefits; and/or (d) Provident's handling of claims for disability benefits.

<u>Request No. 17</u>: From 1999 to the present, produce any lawsuits or administrative complaints that have been filed by any person including, without limitation, any complaints filed by any state or federal agency, against Provident that concern, refer or relate to: (a) any allegation that Provident pressured its employees and/or doctors to deny or terminate claims for disability benefits; (b) any allegation that Provident set targets, goals or projections regarding the rate or number of denial of claims for disability benefits; (c) any allegation that Provident provides financial incentives to any person to deny or terminate claims for disability benefits; and/or (d) Provident's handling of claims for disability benefits.

3. We have identified approximately 1,782 lawsuits from January 1, 1999 through March 5, 2004 in which Provident Life and Accident Insurance Company was a named party and 3,149 lawsuits from January 1, 1999 through March 5, 2004 in which UnumProvident Corporation and/or Provident Life and Accident Insurance Company was a named party.

4. We have identified approximately 3,067 consumer complaints from January 1, 1999 through March 9, 2004 that have been filed against Provident Life and Accident Insurance Company and 15,179 consumer complaints from January 1, 1999 through March 9, 2004 that have been filed against all of the insuring subsidiaries of UnumProvident Corporation.

5. These discovery requests are burdensome and would be an extremely expensive project for Provident to undertake. To comply with Plaintiff's requests, Provident would be required to manually retrieve, review and copy all litigation files and consumer complaints.

6. Therefore, based on my understanding approximately 18,328 litigation files and consumer complaints would need to be gathered. Once those files have been gathered, based upon my knowledge and belief, it is estimated that it would take an average of approximately 20 minutes per file to locate each file and retrieve it from storage. The clerks who would perform this task are paid approximately Eight and 00/100 Dollars ($8.00) per hour. In my estimation, it would cost approximately Forty-Eight Thousand Eight Hundred and Seventy-Four and 64/100 ($48,874.64) Dollars just to locate and retrieve the files.

7. After locating each of the files, a paralegal would then have to review each file for attorney-client communications. The average salary for a Provident paralegal is Twenty-five ($25.00) Dollars per hour. I estimate that it would take an experienced paralegal a minimum of one hour to adequately review the file. Therefore, it would take approximately 18,328 man-hours and cost Provident Four Hundred Fifty-Eight Thousand Two Hundred and 00/100

   ($458,200.00) Dollars to review all the litigation and consumer complaint files.

8. These above estimates are simply for retrieving and identifying potentially responsive files. Any overtime incurred in completing the task is not included. Moreover, the above estimates do not include any charges for copying of any documents, either as to actual photocopying charges or to associated manpower costs involved in the copying.

9. Based upon my knowledge and belief, it is estimated that each litigation file averages 500 pages. The cost for copying each page is approximately Twenty cents (.20). In my estimation, it would cost approximately Three Hundred Fourteen Thousand Nine Hundred and 00/100 ($314,900.00) Dollars just to copy the 3,149 litigation files in which UnumProvident and/or Provident Life and Accident Insurance Company was a named party and One Hundred Seventy-Eight Thousand Two Hundred and 00/100 ($178,200.00) Dollars to copy the 1,782 litigation files in which Provident Life and Accident Insurance company was a named party.

10. Moreover, to comply with the Plaintiff's Request for Documents, Provident will experience business disruption. Experience law department representatives would be forced to abandon their normal duties to comply with the Plaintiff's Requests. Alternatively, Provident would be forced to hire costly temporary personnel to perform this onerous task.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Marci K. Brokish*

MARCI K. BROKISH

Dated: 3/10/2004

# Exhibit B



# UNUM.

*Protecting everything you work for*

March 6, 2001

Carmody & Torrance, LLP
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT 06721-1110
ATTN: GUS SOUTHWORTH, III, ESQ.

Re: Walter Scott Peterson, M.D.
    Policy/Claim #: 52-00817087-002 and 52-00751908-002

Dear Mr. Southworth:

This letter is written to update you on the status and determination of your client's above-referenced claims for disability benefits.

Our records indicate that Dr. Peterson has been filing a claim for s/p Myocardial Infarction and s/p PTCA with stent deployment. It appears that your date of disability is July 11, 2000. We show that you have been under the care and treatment of Dr. James Flint (Cardiologist) since the onset of your claim.

According to a Cardiac Assessment Form completed on November 23, 2000, your Attending Physician Dr. James Flint stated that you were an American Heart Association Class 1 (no limitation). He further reiterated your condition by stating that you did not have any of the following: Hypertension (controlled), Diabetes, Congestive Heart Failure, Angina or Shortness of Breath. He restricted you from the performance of "surgery".

On November 27, 2000, you and your attorney met with our Field Representative Mike Kunkin. During this interview, Dr. Peterson stated he was working full-time with exception of performing surgeries and that he had lost 35 pounds since his Myocardial Infarction.

During the course of our claim review, we ordered all of the necessary medical records in relation to your above-mentioned claims. We recently forwarded your claim file over to our Medical Department for their review and response.

UNUMPROVIDENT CORPORATION
1 Fountain Square, Chattanooga, Tennessee 37402
423.755.1011
Unum is the marketing brand of UnumProvident Corporation

UPCL00543

Upon review of your file, our Board-Certified Cardiologist Consultant stated, "The patient has well documented coronary artery disease with no current documentation of angina or provocable ischemia. The medical records do not support that the patient can no longer perform his full time surgical work. There is no data presented that support that he falls within a high risk group for a cardiovascular event. There is no data presented that would support that this patient is at high risk for mental stress induced ischemia. It must be noted that mental stress induced ischemia is not common in patients with no exercise induced ischemia. Objective data in the medical record would support that the patient should be able to perform a light occupation".

In order to document your occupational duties as they relate to his medical condition, our Vocational Department reviewed your claim file. Through their review, our Vocational Rehabilitation Consultant (VRC) concluded that:

"On the Physician Questionnaire in the file, Dr. Peterson identified the important duties of his occupation in order to priority as follows:

1) Performance of cataract/intraocular lens implant surgery
2) Care of complications of cataract/intraocular surgery, including re-operations
3) Pre and post-operative care associated with #1 and #2
4) Consultations regarding cataracts and decreased vision
5) Following patients suffering from cataracts not yet scheduled for surgery
6) Other general ophthalmology incidental to cataracts

Dr. Peterson listed the routine physical requirement of the job and the percentage of time spent in each activity as follows:

| | |
|---|---|
| Bending | approximately 30% of day |
| Standing | approximately 10% of day |
| Walking | approximately 25% of day |
| Sitting | approximately 35% of day". |

In conclusion, our VRC stated that "Dr. Peterson's occupation as Ophthalmologist and Ophthalmic Surgeon is performed at the Light exertional level".

In order to gather additional information in relation to Dr. Peterson's current medical condition, we requested that a Nurse Case Manager (NCM) meet with Dr. James Flint. After numerous attempts, our NCM was unsuccessful in meeting with Dr. Flint; however, Dr. Flint did respond to a letter posed from the NCM.

UPCL00542

In this letter, Dr. Flint stated (in part) "He completed 9 minutes and 16 seconds of a standard Bruce protocol...He had no chest pain and no ST depressions. He did have frequent PVC's with exercise and recovery and his BP response to exercise was normal. The cardiolite SPECT scan did not show any ischemia...He is functional class 1 according to the American Heart Association functional classifications...Dr. Peterson is not under any specific treatment for stress and has not been in the past to my knowledge, although AHA has addressed the issue of stress and feels that the stress of employment cannot be isolated from the stress from everyday life".

Upon receipt of this report, I referred Dr. Peterson's claim file (along with the Genex report) to our Board-Certified Cardiologist Consultant for review and response. Through his review, he stated "there is no objective evidence presented that would support a conclusion other than that rendered by" the prior reviewer.

It is important to define both Total Disability and Residual Disability as they apply to your policy (#751908) and current claim (52-00751908-002).

"Total Disability or totally disabled means that due to injuries or sickness:

1) You are not able to perform the substantial and material duties of your occupation; and
2) You are receiving care by a Physician which is appropriate for the condition causing the disability".

"Residual Disability or residually disabled, during the elimination period, means that due to injuries or sickness:

1) you are not able to do one or more of your substantial and material daily business or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
2) you have a loss of monthly income in your occupation of at least 20%; and
3) you are receiving care by a physician, which is appropriate for the condition causing the disability.

After the elimination period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that due to injuries or sickness:

1) you have a loss of monthly income in your occupation of at least 20%; and
2) you are receiving care by a physician which is appropriate for the condition causing the disability."

It is important to define Total Disability as it applies to your policy (#817087) and current claim (52-00817087-002).

UPCL00541

"Total Disability and totally disabled means that due to injuries or sickness, the insured:

1) is unable to perform the substantial and material duties of his/her occupation; and
2) is receiving care by a physician which is appropriate for the condition causing the disability".

(We suggest that you refer to your own policy contracts for the exact wording of the definition of Total Disability and Residual Disability as your policies may have had improvements on the policy language).

While both Dr. Peterson and Dr. Flint state that he is unable to perform the full duties of his occupation (Ophthalmologist), including surgery, this statement is not supported by all of the medical records, medical testing and other information provided to us and currently contained in the claim file. Therefore, our position at this time is that he does not meet the definition of disability (total or residual) under the terms of the policies and no benefits are due under the policies.

It is important to note that our contracts are such that we are obligated to pay benefits if an insured has a disability that precludes him/her from working in his/her occupation on a full-time basis or part-time basis, whichever the case may be. Our policies do not cover a choice made to reduce the hours or limit surgical activity to guard against the possibility of future risk to one's health. In fact, our policies only agree to cover present-day sickness or injury and do not cover the possibility of some future event.

In making our decision, UnumProvident reserves all rights and defenses afforded by the policy. This determination on your claim has been based on the information presently available in your claim file. If you believe this determination was made in error and you have additional information of which we are not aware of, please submit this information in writing so we may consider it.

This action is based on the information currently in our file. If you are not satisfied or do not agree with the reason for the denial of your claim, an appeal can be made to:

UnumProvident<br>
Quality Review – 1 North<br>
1 Fountain Square<br>
Chattanooga, TN 37402

The appeal must be in writing and should contain the following information:

- The reason for the appeal and/or disagreement
- Your name, policy number and Social Security Number; and
- Medical evidence or documentation

Evidence of documentation may include but is not limited to such material as:

- Additional treatment records from physicians,
- Actual test results (e.g. EMG, stress tests, electrophysiologic studies), or
- Functional Capacity Evaluation results

The appeal must be made within 90 days of the date this letter is received.

It appears that your policies are governed by the Employee Retirement Income Security Act (ERISA). You may request a review of this denial by writing to us. The written request for a review must be sent within 90 days of the receipt of this letter and state the reason why it is felt the claim should not have been denied. Include any documentation (e.g. Medical Data) that is felt to support the claim. Under normal circumstances, you will be notified of the final decision within 60 days of the date the request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after the request is received.

Nothing in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. Should you have any information that would prove contrary to our findings, please submit it to us. We will be pleased to review any information you may wish to submit.

If you have any questions, please do not hesitate to contact me at 1-800-451-8464, ext. 1648

Sincerely,

Ramine Poureshmenantalemy
Customer Care Center
Provident Life and Accident Insurance Company and affiliates

UPCL00539

CC: Walter Scott Peterson, M.D.

UPCL00538



March 11, 2002

Mr. Domenico Zaino, Jr.
Carmody & Torrance, LLP
50 Levenworth Street
PO Box 1110
Waterbury, CT 06721-1110

Walter Scott Peterson, MD
Claims #52-00817087-002 and #52-00751908-002

Dear Mr. Zaino:

I am writing to advise you that the appellate review of Dr. Peterson's claim for disability benefits has been completed. Regrettably, I have determined that no disability benefits are payable, and I have upheld the determinations made by the Customer Care Center. This letter will outline my reasoning for this determination.

As you are aware, Dr. Peterson's Disability policies contain the following definitions:

Under Policy #751908, the definitions are:

> "**Total Disability or totally disabled** means that due to Injuries or Sickness:
>
> 1.  you are not able to perform the substantial and material duties of your occupation; and
>
> 2.  you are receiving care by a Physician which is appropriate for the condition causing disability."

Your occupation means the occupation (or occupations, if more than one) in which are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation."

"**Residual Disability or Residually Disabled**, during the Elimination Period, means that due to Injuries or Sickness:

> 1.  you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
>
> 2.  you have a loss of monthly income in your occupation of at least 20%; and

   3. you are receiving care by a Physician which is appropriate for the condition causing disability.

After the elimination period has been satisfied, you are no longer required to have a loss of duties or time.

Residual Disability or Residually Disabled then means that due to injuries or sickness:

   1. you have a loss of Monthly Income in your occupation of at least 20%; and

   2. you are receiving care by a Physician which is appropriate for the condition causing the disability.

Disability Policy 817087 defines Total Disability as:

"**Total Disability or Totally Disabled** means that due to Injuries or Sickness, the Insured:

   1. is unable to perform the substantial and material duties of his/her occupation; and

   2. is receiving care by a Physician which is appropriate for the condition causing disability."

Material to the consideration for payment of disability benefits is the evaluation of the extent to which Dr. Peterson is unable to perform the duties of his occupation as a result of his medical condition. On his claim for disability benefits, Dr. Peterson indicated he experienced a heart attack(subendocardial infarction) on July 11, 2000. Dr. Peterson claims total disability is the result of his inability to perform surgery, and then later Dr. Peterson explained that he is unable to perform surgery as a result of the stress he experiences in performing the surgery and its impact on his cardiac condition.

The medical documentation in Dr. Peterson's file regarding his cardiac condition suggests a favorable outcome to treatment after his myocardial infarction. Examples of this can be seen in Dr. Flint's treatment notes:

> **June 19, 2000**   "Scott Peterson came in today. Eight days ago, he had a non-Q wave MI. There were no EKG changes, but his CPK went up to the 700's. One week ago, cardiac catheterization revealed occlusion of the large circumflex marginal which was dilated and stinted. He was also noted to have a 70% stenosis in the LAD at the bifurcation into the diagonal. He had some minimal plaquing elsewhere. At the time of his angioplasty, there was a hematoma in his right groin.
>
> Since discharge, he has had no angina. He has had no symptoms of heart failure or arrhythmias. He has had some discomfort in his right groin, which is progressively diminishing. He has noted some intermittent fatigue."

UPCL00606

3

> **August 9, 2000** "Scott Peterson came in today. He is feeling very well. His fatigue is less. He had one episode of very mild chest tightness that was quite vague. He took a nitro. He is not sure whether it had any effect. Other than that, he has had no chest symptoms, no palpitations, dizziness, edema, orthopnea, or PND. He started working half days this week. His LDL is 88, HDL is 22, and triglycerides are 225.
>
> ...PSYCHIATRIC: No significant mood alteration."
>
> **October 17, 2000** "Scott Peterson came in today for follow-up. He had a cardio light stress test done, which was negative. He achieved a heart rate of 145. He had no angina, no ST depressions, no ischemia on the cardiac light speck scan, and his EF was 52%. He did have increasing PVC's with exercise, but no complex arrhythmias. He reports that he gets PVC's occasionally in rehab. He feels very well. He does not have chest pain, palpitations, dizziness or syncope, edema, occasionally in rehab. He feels very well. He does not have chest pain, palpitations, dizziness or syncope, edema orthopnea or PND. He is on Niaspan, and he has two nights where he had itching and flushing but otherwise is tolerating this pretty well without side effects. He is due to have a tooth implant, for which he will hold his aspirin.
>
> ...PSYCHIATRIC: No significant mood alteration."

This above information suggests that soon after his myocardial infarction, Dr. Peterson had reported doing very well. It appears that Dr. Peterson reported working half days within a month after his myocardial infarction, and Dr. Flint did not record any concerns with this, nor did he record that he felt this return to work was clinically contraindicated.

As you are aware, Dr. Peterson's file was reviewed by two consulting cardiologists. The opinions of the cardiologist who reviewed the information in Dr. Peterson's file indicated that the medical record(s) does not support that Dr. Peterson could no longer perform his full time surgical work.

Given that Dr. Peterson's claimed occupation of a Opthalmic Surgeon is performed at the *light* exertional level, the medical records do not appear to support that he would not be prevented from performing full time work, and Dr. Peterson completed a cardiac rehabilitation program, it does not appear that Dr. Peterson's current *physical* condition would prevent him from performing ophthalmological surgery.

It appears that Dr. Peterson's subjectively reported level of stress when performing surgery, and it's perceived potential impact on his medical condition that forms the basis for Dr. Peterson's providers opinions that he is unable to perform surgery. It appears that Dr. Peterson had reported experiencing stress in performing surgery prior to his myocardial infarction. This information suggests that despite some reported stress, Dr. Peterson was nevertheless able to perform the duties of his occupation. Because Dr. Peterson reports that he has not returned to surgery since his myocardial infarction, it is unclear whether his reported degree of stress prevents him from performing the duties of his occupation.

UPCL00605

4

The information received from Drs. Flint, Solnit and Cohen suggest that Dr. Peterson is unable to perform surgery is based on his representation of the stress he experienced (prior to his myocardial infarction) and the impact they believe it may have on his condition.
It appears that the medical opinions of Dr.s Flint, Solnit and Cohen are based on the subjective report of Dr. Peterson, and conjecture that he may be at risk if he were to return to performing surgery without objective medical evidence to support this. The consulting cardiologist who reviewed Dr. Peterson's file has indicated 1.) that there has been no data presented to suggest that Dr. Peterson is in a high risk group for a cardiovascular event based on accepted standards, and 2.) that the medical record does not provide sufficient documentation to support that the intermittent mental stress of performing surgery or the mental stress of daily living will increase his cardiovascular risk. It is important to recognize that disability benefits are considered when there is a current or ongoing *inability* to perform the duties of an occupation. Benefits are not considered payable for a condition that may or may not cause an inability to perform occupational duties at some point in the future.

The extent to which Dr. Peterson's mental stress could prevent him from performing the duties of his occupation has been considered and evaluated. Our Consulting Psychiatrist has reviewed Dr. Peterson's file and has indicated; 1.) that there is no psychiatric diagnosis, restrictions or limitations or treatments that have been identified, 2.) that no specific psychological factors for his subsequent cardiac events had been identified (i.e. no active psychiatric disorder with significant levels of anxiety, depression, or irritability that requires or is resistant to treatment, no evidence of unstable cardiac condition an no evidence of emotionally induced ischemia or any other postulated risk factors) and 3.) that there is no discussion as to why other alternatives (e.g. interventions including psychiatric and/or psychologic treatment including stress management and/or reducing the relative number of procedures) have not been considered.

Significantly, though Dr. Peterson claims Total Disability resulting from the stress he reportedly experiences in performing surgery, there is no indication that Dr. Peterson has sought nor has his doctors suggested, any active or ongoing treatment or interventions for a condition that is reportedly totally disabling in nature. If Dr. Peterson wished to be able to return to performing surgery, it is reasonable to expect that he or his providers would seek treatment or intervention to reduce his subjective experience of stress so that he could return to performing surgical duties.

It is important to note that each of the definitions of Disability (Total or Residual) require that Dr. Peterson be *under the care of a physician which is appropriate for the condition causing disability*. It appears that Dr. Peterson's claim for disability is supported by the opinion that stress prevents him from performing surgery. Though Dr. Peterson has been under the care of Dr. Flint for his cardiac condition, we have not received information that Dr. Peterson has been under the care of a physician which is appropriate for the condition causing disability (stress.) Resultantly, it does not appear that Dr. Peterson meets the definitional requirement of either Total or Residual Disability, and as such, benefits are not payable.

I would like to take this opportunity to note address an issue that was raised in a letter dated May 31, 2001 from Augustus R. Southworth, III, of your firm. Mr. Southworth suggests that because Dr. Peterson's occupation is described as an "Ophthalmic Surgeon Specializing in Cataract and Implant Surgery" and that nearly all of Dr. Peterson's occupational duties prior to his disability were related to the performance of cataract or implant surgery, that "there can be no dispute that Dr. Peterson's

UPCL00604

inability to perform such duties would render him totally disabled under the terms of his policy, regardless of the fact that he may be able to perform other duties." I respectfully disagree with this assertion.

When he submitted his claim for benefits, Dr. Peterson himself wrote:

> "I worked an average of 50 hours per week during the year prior to my disability, including performing cataract and intraocular lens implant procedures in the Surgery Center, care of complications of cataract and intraocular lens implant surgery including re-operations, pre- and post-operative care of cataract patients, and long term care of patients with cataracts who were not yet prepared or scheduled for surgery. A very small part of my practice consisted of routine general ophthalmology, frequently for patients with conditions in addition to their cataracts.
>
> Time devoted to operative procedures averaged five hours per week; pre-operative and post-operative care of those patients, in the office, comprised approximately 42 hours per week. Of the remaining few hours in the office, the majority of time dealt with care rendered to patients with cataracts not yet prepared or scheduled for surgery.
>
> In addition, I devoted several hours per week to administrative matters at the practice, and about five days per year to Continuing Medical Education."

Dr. Peterson reports that he is unable to perform the surgical duties of his occupation. It appears that these duties accounted for approximately five hours out of a 50 hour workweek, about 10% of his full time work schedule. It appears that Dr. Peterson retains the capacity to perform the in-office work and non-surgical work he reportedly performed for the other hours of his work week.

As noted previously in this letter, disability benefits are not considered payable because it does not appear Dr. Peterson is *unable* to perform surgical duties, and it does not appear that he meets the definitional requirement that he be under the care of a physician which is appropriate for the condition causing disability. Even if disability benefits were payable, it appears that Dr. Peterson would only be prevented from performing the surgical duties of his occupation, and as such, consideration would be given to Residual Disability rather than Totally Disability under policy #751908.

Dr. Peterson's Policy #817087 only contains a definition for Total Disability and does not have a definition for Residual Disability. Even if Dr. Peterson is unable to perform the surgical duties of his occupation (approximately 10% of his work schedule of 50 hours per week) he appears to have retained the capacity to perform the other duties his occupation (approximately 90% of his 50 hour week work schedule.) This suggest that Dr. Peterson's condition is not totally disabling in proportion, and benefits are not payable for this claim

In sum, a review of the clinical information in Dr. Peterson's file does not suggest that his condition renders him unable to perform surgery. If evidence demonstrated that Dr. Peterson was unable to perform surgery, it appears that "stress" is identified reason for the disability. However, Dr. Peterson does not appear have been under the care of a physician which is appropriate for the condition

UPCL00603

6

causing disability for his reportedly disabling stress and it's impact on his performing surgery, and as such he does satisfy definitional requirements for disability. Resultantly, I do not find disability benefits are payable.

I regret that this determination could not be more favorable to Dr. Peterson.

Sincerely,


Deborah Kozisek
Appeals Consultant
Quality Performance Support
UnumProvident Corporation

UPCL00602