# EXHIBIT 1

Westlaw.

Slip Copy
2004 WL 557380 (N.D.Ill.)
(Cite as: 2004 WL 557380 (N.D.Ill.))

Page 1

C
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

COLIN HANN, CAROL GALLAGHER, and Import Logistics, Inc., Plaintiffs,
v.
THE PAUL REVERE LIFE INSURANCE COMPANY, Provident Life & Accident Insurance Company, and UnumProvident Corporation Defendants.

No. 03 C 1062.

Feb. 17, 2004.

James Martin Harman, Harman, Fedick & O'Connor, Ltd., Chicago, IL, for Plaintiff.

Steven R. McMannon, W. Sebastian von Schleicher, Michael J. Smith & Associates, Michael J. Smith, Attorney at Law, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.

*1 Plaintiffs Colin Hann ("Hann") and Carol Gallagher ("Gallagher") own Plaintiff Import Logistics. After Hann lost his hearing, he, Gallagher, and Import Logistics filed suit against defendants The Paul Revere Life Insurance Company ("Paul Revere"), Provident Life & Accident Insurance Company ("Provident Life"), and UnumProvident Corporation ("UnumProvident") seeking to recover disability benefits. Plaintiffs contend that UnumProvident wrongfully refused to pay plaintiffs' claims under three disability insurance policies and its refusal to pay was unreasonable and vexatious in violation of § 155 of the Illinois Insurance Code, 215 ILCS § 5/155. UnumProvident responds that the plaintiffs' claims against it must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because it did not issue any of the policies which purportedly covered Hann. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the following reasons, the motion to dismiss is denied.

I. *Background*

This complaint alleges the following facts which are taken as true for purposes of ruling on the motion to dismiss. *Fredrick v. Simmons Airlines, Inc.,* 144 F.3d 500, 502 (7th Cir.1998). Hann and Gallagher own and work at Import Logistics. Hann permanently lost his hearing and contends that he is completely disabled. Plaintiffs claim they are entitled to receive benefits under three disability insurance policies, two of which were issued by Paul Revere and one of which was issued by Provident Life. UnumProvident is Paul Revere's and Provident Life's corporate parent.

According to plaintiffs' complaint, UnumProvident administered claims for Paul Revere and Provident Life and controlled their claims process and practices. Plaintiffs allege that UnumProvident processed Hann's disability claims under the Paul Revere and Provident Life policies and wrongfully decided not to pay benefits to him. They contend that UnumProvident's failure to pay benefits constitutes a breach of contract (Counts II, IV & VI) and that UnumProvident unreasonably and vexatiously refused to pay Hann's claims in violation of 215 ILCS § 5/155 (Counts VIII, X & XII).

II. *Discussion*

In ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must assume the truth of all facts alleged in the complaint, construing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy  
2004 WL 557380 (N.D.Ill.)  
**(Cite as: 2004 WL 557380 (N.D.Ill.))**

Page 2

the allegations liberally and viewing them in the light most favorable to the plaintiff. *McMath v. City of Gary,* 976 F.2d 1026, 1031 (7th Cir.1992); *Gillman v. Burlington N. R.R. Co.,* 878 F.2d 1020, 1022 (7th Cir.1989). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kunik v. Racine County, Wis.,* 946 F.2d 1574, 1579 (7th Cir.1991).

UnumProvident contends that the claims against it must be dismissed because UnumProvident did not issue the policies to Hann and therefore, there is no privity of contract between it and Hann. An insurance policy is a contract between an insurer and its insured, and a breach of contract claim may only be asserted against a party who is in privity of contract. *Kaplan v. Shure Brothers, Inc.,* 266 F.3d 598, 602 (7th Cir.2001). Moreover, courts generally presume that a parent corporation is a separate and distinct entity from its subsidiaries. *Van Dorn Co. v. Future Chemical & Oil Corp.,* 753 F.2d 565, 569 (7th Cir.1995). These rules support UnumProvident's contention that it is not liable for policies issued by its subsidiaries. However, plaintiffs assert that the Court should pierce the corporate veil and hold UnumProvident liable for its subsidiaries' policies because UnumProvident controlled the claims process and practices of its subsidiaries.

\*2 To pierce a corporate veil in Illinois, a plaintiff must establish that: (1) "there is such a unity of interest and ownership" that the separate personalities of the corporation and its subsidiaries no longer exist; and (2) "adhering to the fiction of a separate corporate existence would promote injustice or inequity." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.,* Nos. 02-4079 & 02-4188, - F.3d -, 356 F.3d 731, 2004 WL 103311 at \*4 (7th Cir. Jan 23, 2004). When determining if a parent and subsidiary have a unity of interest, courts consider whether: (1) the corporations have failed to maintain adequate records or to comply with corporate formalities; (2) the corporations' assets are commingled; (3) the subsidiary is undercapitalized; or (4) the subsidiary treats the assets of the parent corporation as its own. *Van Dorn Co.,* 753 F.2d at 570. With respect to whether adhering to the fiction of a separate corporate existence is appropriate, courts look to whether "unfairness ... akin to fraud or deception" or "the existence of a compelling public interest" exists. *Hystro Products. Inc. v. MNP Corp.,* 18 F.3d 1384, 1390 (7th Cir.1994).

Plaintiffs assert that the Court should pierce the corporate veil because UnumProvident controlled the claims process and practices of its subsidiaries, personally processed Hann's disability claims, and was responsible for the decision not to pay them. According to the plaintiffs, this means that UnumProvident is a "mere shell" for its subsidiaries who actually issued Hann's disability policies. UnumProvident contends that the plaintiffs have failed to allege facts which show that the corporate veil should be pierced.

Under Rule 8(a)'s liberal notice pleading standards, the court will not dismiss a complaint unless it is clear that the plaintiff cannot potentially establish facts consistent with the pleadings which entitle her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Moreover, a plaintiff does not need to allege facts supporting every element of her legal theory. *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir.1998) (contrasting notice pleading with the heightened pleading used for fraud claims). Thus, a plaintiff can plead conclusions as long as they give the defendant minimal notice of her claims. *See Payton v. RushPresbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 627 (7th Cir.1999) (pleadings generally only need to contain enough to allow the defendant to understand the gravamen of the complaint). Accordingly, if a plaintiff alleges that a parent is the alter ego of its subsidiary, dismissal of her complaint is unwarranted if she alleges any facts which suggest that the corporations operated as a single entity. *See Kellers Systems, Inc. v. Transport Intern. Pool, Inc.,* 172 F.Supp.2d 992, 1001 (N.D.Ill.2001); *see also Ishkhanian v. Forrester Clinic S.C.,* No. 02 C 9339, 2003 WL 21479072 at \*3 (N.D. Ill. Jun 25, 2003) (rejecting contention that a complaint must contain facts which substantially show that the corporate veil should be pierced to survive a motion to dismiss for failure to state a claim).

\*3 Here, the plaintiffs seek to pierce the corporate

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 557380 (N.D.Ill.)
(Cite as: 2004 WL 557380 (N.D.Ill.))

Page 3

veil and hold UnumProvident liable for insurance contracts made by Paul Revere and Provident Life. Plaintiffs allege that UnumProvident controlled all of its subsidiaries' claims processing and policies and made the decision to deny Hann's claims for benefits. *Daley v. American Drug Stores, Inc.*, 294 Ill.App.3d 1024, 229 Ill.Dec. 373, 691 N.E.2d 846, 849 (Ill.App.1998) (stating court will pierce corporate veil if one corporation so controls the affairs of another that the other is the mere instrumentality or dummy of another and that, under the circumstances, the observance of the fiction of separate corporate existence will sanction fraud or injustice.). This is enough to place UnumProvident on notice of the plaintiffs' claims and satisfy the undemanding federal notice pleading standard at this early stage in the proceedings. UnumProvident's motion to dismiss the plaintiffs' breach of contract claims is thus denied.

UnumProvident also seeks to dismiss plaintiffs' claims against it pursuant to 215 ILCS § 5/155 for vexatious and unreasonable conduct in refusing to pay Hann's disability claims. Section 155 of the Illinois Insurance Code provides, in pertinent part, that a court may award fees and costs "[i]n any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable." 215 ILCS § 5/155(1). UnumProvident contends that it cannot be liable under § 155 as a matter of law because it did not have a contractual relationship with Hann.

The Court is not persuaded by UnumProvident's argument. In its memorandum, UnumProvident argued that plaintiffs failed to allege any legal obligation on UnumProvident's part to pay Hann's disability claim because "[p]laintiffs have not alleged that UnumProvident acted as an undisclosed principal of Paul Revere or Provident Life, or *that UnumProvident is liable for the contractual obligations of its subsidiaries under a corporate veil theory.*" Def's Memo, p. 5 (emphasis added). Plaintiffs make clear in their Response that they seek to hold UnumProvident liable for the contractual obligations of its subsidiaries under a corporate veil theory. Plaintiffs contend that UnumProvident is really a dummy or sham for Paul Revere and Provident Life because it controls the claims process and practices of its subsidiaries. UnumProvident cites one case holding that § 155 liability cannot attach to a defendant who does not owe benefits under an insurance policy. UnumProvident does not cite and the Court has not found any authority holding that a plaintiff who ultimately pierces the corporate veil and holds a corporate parent liable for policies issued by its subsidiaries can not hold the parent liable under § 155. Because the Court can grant a motion to dismiss only if it appears beyond doubt that plaintiffs can prove no set of facts entitling them to relief, the Court denies UnumProvident's Motion to Dismiss Counts VII, X & XII.

III. *Conclusion*

*4 For the reasons stated above, UnumProvident's motion to dismiss [21-1] is denied.

2004 WL 557380 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

- 1:03CV01062 Docket)
    (Feb. 12, 2003)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 2

**Westlaw.**

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 1

C  
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,  
E.D. Pennsylvania.

Janet ROSEN,  
v.  
PROVIDENT LIFE AND ACCIDENT  
INSURANCE COMPANY, UnumProvident  
Corporation, and  
GE Capital Information and Technology  
Solutions-North America, Inc.

Civil Action No. 02-591.

Sept. 30, 2003.

Andrew S. Abramson, Law Offices of Andrew S. Abramson, Jenkintown, PA, for Plaintiff.

Elizabeth A. Venditta, White & Williams, LLP, Philadelphia, PA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RUFE, Judge.

*1 Before the Court are the Cross-Motions of Plaintiff Janet Rosen ("Rosen" or "Plaintiff") and Defendants Provident Life and Accident Insurance Company ("Provident"), UnumProvident Corporation ("UnumProvident") [FN1] and GE Capital Information and Technology Solutions-North America, Inc. ("GE Capital") [FN2] in this action alleging violations under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

FN1. Although Provident was the administrator of the ERISA plan at issue, Rosen named both Provident and its parent company, UnumProvident, as defendants in this case. Throughout most of this Memorandum Opinion, the Court uses the names "Provident" and "UnumProvident" interchangeably. As set out below, whether Provident is a proper party cannot be resolved at this stage of the litigation.

FN2. GE Capital was named as a defendant because it continually deducted a "Buy-Up" premium for long-term disability coverage from Rosen's paycheck. Based upon testimony from a Provident representative, Rosen agrees to withdraw this claim as it relates to GE Capital only. *See* Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment, p. 1 n. 1. Accordingly, the Court shall dismiss with prejudice pursuant to Fed.R.Civ.P. 41(a) all claims advanced against G.E. Capital.

**FACTUAL BACKGROUND**

Rosen was employed as a senior account representative with GE Capital, where she earned in excess of $142,000.00 per year. She was a participant in an employee welfare benefit plan under which she was provided short-term and long-term disability benefits. Beginning in November of 1999, Rosen allegedly developed pain in her neck, shoulder and arms, and was subsequently diagnosed with polymyalgia rheumatica, a disorder that causes stiffness and aching of the muscles in the neck, shoulder, and hip areas. Rosen thereafter submitted a claim for disability benefits under a policy issued by Provident, claiming that she was unable to perform her essential job functions, including driving long distances, sitting at her computer, and talking on the telephone for long periods of time. As part of her employment benefits package, Rosen received

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 2

short-term disability benefits (under Plan No. 122806-01), and long-term disability benefits (under Plan 122806-02) through June 28, 2001. Under the short-term policy, benefits were paid at the rate of sixty percent of earnings, not to exceed $629.31 per week, for a maximum of six months. *See* Group Short-Term Disability Insurance Policy, p. 4. The provisions of the long-term policy paid disability benefit at either sixty percent with a monthly maximum benefit amount of $3,000.00, or at seventy percent with a monthly maximum benefit amount of $7,000.00, depending on whether the employee is also enrolled in the "buy-up" plan. [FN3] *See* Group Long-Term Disability Insurance Policy, pp. 3- 4. Both policies provided that an employee is *disabled* if due to sickness or injury the employee is "unable to perform each of the material duties of the occupation that you regularly perform for the Employer...." Group Short-Term Disability Insurance Policy, p. 6; Group Long-Term Disability Policy, p. 9.

> FN3. Under the "buy-up" option, employees could increase their disability coverage. Upon enrolling for the additional benefits, an extra premium would be deducted automatically from the employee's bi-weekly paycheck.

On December 15, 1999, Provident notified Rosen that she was approved for short-term benefits for up to three months. *See* Memo from UnumProvident to GE Capital of 12/15/00. Then, on April 20, 2000, UnumProvident notified GE Capital that Rosen's claim was denied because "[t]he tests turned out negative and there appears to be no substantiation of further disability." Memo from UnumProvident to GE Capital of 4/20/00. On May 11, 2000, Rosen appealed the decision to deny further benefits. On June 9, 2000, UnumProvident advised Rosen that its appellate review was complete and that the decision to terminate was being upheld. *See* Correspondence from UnumProvident to Rosen of 6/9/00. At that time UnumProvident advised Rosen that she could submit additional objective medical documentation in support of her claim within 30 days before the decision became final.

*2 On June 30, 2000, Dr. Robert A. Kimmelheim forwarded to a UnumProvident Appeals Consultant a report in which he stated that he believed that Rosen continued to suffer from polymyalgia rheumatica; that she was taking Prednisone; and that she was still experiencing pain in her neck, upper arms, and thighs. Dr. Kimmelheim recommended that Rosen remain on disability since her job required her to do a substantial amount of driving and looking at a computer screen for extended periods of time, tasks that result in increased pain and stiffness. *See* Report from Dr. Robert A. Kimmelheim to Marilyn Howard of 6/30/00.

On October 11, 2000, UnumProvident secured a medical opinion from Dr. Jacob Martin, a UnumProvident in-house physician. Dr. Martin noted that due to the variable diagnostic criteria for polymyalgia rheumatica, it was difficult to confirm the diagnosis. He requested a consultation with Dr. John G. Paty, Jr., a UnumProvident in-house rheumatologist.

Upon reviewing Rosen's medical history, Dr. Paty concluded that Rosen's symptoms were consistent with Dr. Kimmelheim's diagnosis. Dr. Paty noted that polymyalgia rheumatica typically occurs in patients over the age of 60. [FN4] He also noted that driving, sitting at a computer monitor for prolonged periods of time, and working in a fast-paced environment would be difficult as long as Rosen was symptomatic. *See* Dr. Paty Report of 10/20/00, Ex. 32 to Defendant's Motion. Dr. Paty predicted that the condition should remit within the next 6 to 12 months.

> FN4. Rosen was 57 years old at the time.

On November 15, 2000, UnumProvident notified Rosen that it had overturned the claims decision to deny her claim and that it would begin paying benefits again. Because the decision was overturned, short-term disability benefits were paid retroactively through May 19, 2000 and long-term benefits were paid retroactively beginning on May 20, 2000. When the benefits were paid, they were paid at the rate of $3,000.00 per month, calculated without application of the "buy-up" option.

On February 1, 2001, Dr. Kimmelheim completed

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2003 WL 22254805 (E.D.Pa.)
(Cite as: 2003 WL 22254805 (E.D.Pa.))

Page 3

a form entitled "Attending Physician's Statement of Disability." *See* Ex. 26 to Defendant's Motion. Therein Dr. Kimmelheim restated his diagnosis of polymyalgia rheumatica and osteoporosis; noted Plaintiff was experiencing pain, stiffness in her neck, shoulders, upper arms and thighs; described Plaintiff's condition as "unimproved"; that it was "unknown" when Plaintiff would be able to return to work; that Plaintiff was "incapable" of "sitting for prolonged periods [and] driving for extended periods of time." It appears that Dr. Kimmelheim made a number of handwritten corrections to the form, placing a check in some boxes but then scribbling it out, writing "error" next to it, and checking a different box. One such place this occurs is where the form asks, "Patient is now disabled for: Patient Occupation [Yes][No]; Any Other Work [Yes][No]." Dr. Kimmelheim scribbled out the "Yes" boxes, wrote "error" above them, and checked "No." Next to the "No" boxes he drew a bracket and wrote, "difficulty is with logistics of current job."

*3 On April 3, 2001, Provident and/or UnumProvident required Rosen to be examined by Frank Serino, a physical therapist who they retained to conduct a functional capacity evaluation ("FCE"). On April 6, 2001, Serino issued a report in which he concluded that Rosen could perform her duties at GE Captial. In his report, Serino concluded that Rosen would be "capable of performing work in the light work classifications for an eight hour day basis" and that she "should be able to perform her work duties as a Sales Representative with GE Capital." Report of FCE, p. 3. Serino noted, however, that Rosen may "have some difficulty with driving distances due to her subjective complaints of pain." *Id.* Serino noted that Rosen had driven 40 minutes for his appointment with her and that she demonstrated some discrepancies in her isometric and dynamic lifting tests. *Id.*

UnumProvident had the Serino report reviewed by an in-house RN, Rod Lewis, who suggested in an April 16, 2001 type-written report that the FCE and other records be sent to and reviewed by Dr. Paty. However, Dr. Paty's name was subsequently crossed-out by hand and substituted with Dr. Martin's name, and the records were sent to him for review. *See* Ex. 72 to Plaintiff's Motion. Dr. Martin opined that if driving was an essential job function, he was uncertain whether or not Rosen could perform her duties. Dr. Martin recommended a review of updated office visit notes and job analysis in order to clarify Rosen's work capacity.

On May 1, 2001, Kenneth J. Maxwell, a UnumProvident in-house vocational rehabilitation specialist, determined that Rosen's job description was "vague," but concluded that the occupation "appears to have physical demands of light level work capacity." Vocational Rehabilitation Log of 6/15/01.

On June 20, 2001, Rosen was contacted by telephone and asked whether she had seen a physiatrist or anyone besides Dr. Kimmelheim, her attending physician. She responded that she had not. On June 26, 2001, this information was passed on to Dr. Martin for another consultation. Dr. Martin questioned whether a reduced hour driving format was possible. Dr. Martin's Review of 6/26/01.

On June 28, 2001, Rosen's claim was referred to an Appeals Manager at Provident for review. Based upon the FCE, Job Analysis, and Medical Review, it was determined that Rosen was "no longer prevented from performing the material duties of her occupation." Management Referral. Provident advised Rosen of this decision on June 28, 2001. Correspondence from UnumProvident to Rosen of 6/28/01. It was noted that the Job Analysis states that she drives anywhere from 30 to 120 miles per day, but also reports that she has autonomy over her schedule. Benefits were paid through June 30, 2001, and Rosen was advised of her appeal rights. *Id.*

On August 31, 2001, Rosen appealed the decision to terminate disability benefits. She submitted a March 10, 2001 Social Security Administration Notice of Determination finding that she was totally disabled, as well as an August 29, 2001 report from Dr. Kimmelheim. Said report re-affirmed his previous diagnosis, noted that she continues to take Prednisone, and noted that there had been no change in his prior assessment since June 30, 2002. Ex. 91 to Defendant's Motion, Correspondence from Dr. Kimmelheim to Howard of 8/29/01.

*4 Dr. Martin reviewed the new materials submitted by Rosen but concluded that it provided

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 4

no objective information that would support Rosen's claims that she was unable to drive; could not be around people; and could not sit for long periods of time.

On November 7, 2001, UnumProvident advised Rosen that its decision to deny benefits was being upheld. The letter provided, in relevant part, as follows:

> Based on the information in your claim file, it does not appear that you would be precluded from performing the duties of your occupation. The review of your claim file disclosed your attending physician advised you were not disabled from your occupation, but that your "difficulty is with logistics of [your] current job. The [Functional Capacity Evaluation] indicated you would be capable of performing work in the "light" category of physical demands.... Your occupation of outside sales representative falls within the "light" physical demand category. Thus, it appears you would not be precluded from performing in your occupation.... [I]t does not appear that your occupation requires you to drive long distances on a daily basis. To the contrary, the job analysis provided by your employer indicates that you may work from your and/or travel to customers by car.... It appears that you have control over your schedule such that you could accommodate your condition if need be.
>
> In sum, the medical records provided, according to the previous clinical review do not substantiate an inability to drive, sit for long periods of time, and/or be around crowds of people. Because restrictions and limitations are not such that would preclude your ability to perform the material duties of your occupation, you are no longer eligible for benefits....

Correspondence from Smith to Rosen of 11/7/01, Ex. 103 to Defendants' Motion..

**FACTS RELATING TO THE BUY-UP OPTION**

On December 8, 1999, Rosen sought to change her long-term disability coverage by adding the Buy-Up Option. This request was made several weeks after she had been diagnosed with polymyalgia rheumatica and after she was out of work on short-term disability. Any such change would have been effective January 1, 2000, according to the form Rosen signed. However, given that she was already on disability when she attempted to upgrade her disability coverage, the election could take effect only upon her return to "active work." The policy contains the following active work provisions:

**Active Work or Actively at Work Definition**
Active work and Activity at Work mean that you are performing each of the material duties of the occupation that you regularly perform for the Employer at the Employer's usual place of business.

**Active Work Requirements**
If you are absent from Active Work because of Sickness or Injury on the day before the scheduled effective date of your coverage, your coverage will not become effective until the day after you complete one full day of Active Work as an Eligible Employee.

*5 **Changes in Benefits**
This Active Work requirement also applies to any change in benefits. If you return to Active Work during a Benefit Period (*see* Benefits Period in Section IV--Benefit Provisions), you will not qualify for any change in benefits caused when:
1. your status as a Covered Person of a class changes;
2. your Earnings change; or
3. the terms of the policy change.

Group Long-Term Disability Insurance Policy at 17.

The documentation received from Rosen's employer indicated that a long-term disability buy-up premium in the amount of $4.82 was subtracted from Rosen's bi-weekly severance benefit between January 8, 2000 and April 2, 2000, resulting in a deduction of $38.56. GE Capital did not become aware of the deductions until it was brought to its attention after Rosen commenced the instant civil action.

On August 1, 2002, GE Capital sent Rosen a check in the amount of $40.87, representing the repayment plus interest. *See* Declaration of Markus U. Hartman. Rosen refused to accept payment. As a result of these deductions, Rosen seeks enhanced long-term disability provisions under the buy-up option.

On February 5, 2002, Rosen commenced this action against Provident, UnumProvident, and GE

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2003 WL 22254805 (E.D.Pa.)
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 5

Capital. In her two-count complaint, Rosen advances two claims under 29 U.S.C. § 1129(a)(1)(B). She seeks an order clarifying her rights to past, present and future long-term disability benefits; an award of all past, present and future benefits; pre-judgment interest; and attorney's fees. [FN5]

> FN5. By Memorandum and Order dated October 25, 2002 [Doc. No. 20], the Court denied Rosen's request for leave to file an amended complaint in which she sought to advance a bad faith claim pursuant to 42 Pa. Cons.Stat. § 8371.

### SUMMARY JUDGMENT STANDARD

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catreet,* 477 U.S. 317, 322-32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the Court is confronted with cross-motions for summary judgment, the Court must consider each party's motion individually, and both parties bear the burden of establishing a lack of genuine issues of material fact. *Reinhert v. Giorgio Foods, Inc.,* 15 F.Supp.2d 589, 593-94 (E.D.Pa.1998).

### ERISA STANDARD OF REVIEW

Before reviewing the propriety of the Administrator's determination to deny benefits to Rosen, the Court must determine what standard of review applies. In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the plan confers such discretion, an "arbitrary and capricious" standard of review applies. *Smathers v. Multi-Tool Inc./ Multi-Plastics, Inc. Employee Health and Welfare Plan,* 298 F.3d 191, 194 (3d Cir.2002).

*6 The arbitrary and capricious standard requires that a court must not disturb a plan administrator's interpretation of a plan if it is reasonable. *DeWitt v. Penn-Del Directory Corp.,* 106 F.3d 514, 520 (3d Cir.1997). In other words, a court must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 393 (3d Cir.2000). However, such deference is not required if the decision is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.1997). In conducting its review of the administrator's decision, a court must look to the "record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed." *Id.*

Provident is identified in the Certificate and Policy as the *Claims Fiduciary* and GE Capital as the *Employer, Plan Sponsor,* and *Plan Administrator.* The Certificate provides, in pertinent part, that:

> The Claims Fiduciary [Provident] shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner. Subject to the requirements of law, the Claims Fiduciary shall be the sole judge of the standard of proof required in any claims for benefits and/or in any

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 6

question of eligibility for benefits. All decisions of the Claims Fiduciary shall be final and binding on all parties. Whenever a decision on a claim is involved, the Claims Fiduciary is given broad discretion.

Certificate and Summary Plan Description, p. 21.

Consideration of the proper standard of review does not end with a determination that the arbitrary and capricious standard applies. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.' " *Smathers,* 298 F.3d at 197 (quoting *Firestone,* 489 U.S. at 115). In the Third Circuit, when such a conflict of interest exists, courts adjust the arbitrary and capricious standard using a heightened standard of review in which it applies a sliding scale approach, "intensifying the degree of scrutiny to match the degree of conflict." *Pinto,* 214 F.3d at 379. In contrast to a court's review of the administrator's decision, a court is permitted to examine evidence outside of the administrative record to determine whether there is a conflict of interest. *See id.* at 395; *Dorsey v. Provident Life and Acc. Ins. Co.,* Civ.A.No.01-1072, 2001 WL 1198642, at *8 (E.D.Pa. Oct.1, 2001). In this case, Provident both funded and administered the benefits under the long-term disability benefits plan. Because Provident makes claims determinations and pays the benefits, it operates under an inherent conflict of interest, and the heightened standard applies. In addition, the Court takes note of what appears to be some evidence of bias in the decision making process: (1) the apparent redirection of Rod Lewis' April 2001 report from Dr. Paty (who provided some analysis favorable to Plaintiff's claim) to Dr. Martin (who previously was more skeptical); and (2) Provident's failure to consider the Social Security Administration's determination that Plaintiff was disabled. *See Goldstein v. Johnson & Johnson,* 251 F.3d 433, 435 (3d Cir.2001) (conflict exists and "more searching scrutiny" is required where "the impartiality of the administrator is called into question").

*7 Under this heightened approach, courts must consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review. *Pinto,* 214 F.3d at 393. Factors a court may take into account in determining the appropriate standard of review include: "the sophistication of the parties; the information accessible to the parties; the exact financial agreement between the insurer and the company [and] the current status of the fiduciary." *Id.* at 392. The degree of scrutiny increases in proportion to the degree of the conflict. *Id.* at 379. Evidence of a significant conflict places the case at the far end of the scale, under which the court reviews the administrator's decision with a high degree of skepticism. *Id.* at 395.

In this case, Provident admitted that it determined eligibility for benefits under the long-term disability policy. *See* Plaintiff's First Set of Requests for Admissions and Defendants' Answer thereto. Analyzing the *Pinto* factors, the Court notes that while Rosen was a sophisticated claimant with an advanced college degree, there is no evidence that she was sophisticated in terms of ERISA. [FN6] With respect to the financial arrangement between the parties, Provident asserts that any conflict of interest is ameliorated due to the fact that the policy is "experience rated ." Under an experience rated plan, an insurer recovers the benefit payments it pays outs by adjusting the policy-holder's future premiums in light of the claim history. In this context, Provident asserts, it has no incentive to deny claims because it may recoup benefit payments by adjusting the premium charged. The *Pinto* court suggested in dicta that a conflict of interest may arguably be ameliorated where the plan "is experience-rated because the premiums charged to the employer are adjusted annually based on claims paid the previous year," as the fiduciary's incentive to deny claims is lessened. *Id.* at 388 n. 6 (citing *Metropolitan Life Ins. Co. v. Potter,* 992 F.Supp. 717 (D.N.J.1998)). The final *Pinto* element relates to the status of the fiduciary, such as whether the company is breaking up or laying off a significant portion of its employees. *Id.* at 392. The record is silent as to this last factor.

> FN6. Although Provident notes that Rosen's husband is an attorney who "had been assisting" Rosen with her disability claim, Defendants' Brief in Support of Summary Judgment at 38, there is no support for this in the record, and the Court finds that this allegation is

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
(Cite as: 2003 WL 22254805 (E.D.Pa.))

Page 7

immaterial to its analysis and discussion.

There are insufficient allegations by Rosen to support a substantially heightened review. Nevertheless, based upon the inherent conflict caused by an insurer's role in both funding and administering the claims, and on the difference in level of sophistication of the parties, the Court will apply a heightened review that falls near the middle of the *Pinto* sliding scale.

**PLAINTIFF'S CLAIM FOR BENEFITS**

There was an abundance of information supporting Plaintiff's claim for benefits when Provident ultimately denied her claim on November 7, 2001. On six different occasions, from December 6, 1999 through August 31, 2001, Dr. Kimmelheim provided various reports and records substantiating his diagnosis. In addition, Rosen submitted to Provident a March 10, 2001 Social Security Disability Notice of Determination finding she was totally disabled. Rosen suggests that Provident disregarded this key medical evidence in denying her disability claim. Instead, Rosen asserts, the Provident claims specialists relied upon reports of in-house UnumProvident doctors and specialists (Dr. Martin, Dr. Paty, RN Lewis, and Maxwell), and only one outside medical provider, (physical therapist Frank Serino). She argues that Provident's decision not to have Rosen undergo an independent medical examination or to utilize a peer-to-peer discussion in evaluating Rosen's claim is evidence of bias in the decision making process. In sum, Plaintiff contends that these considerations demonstrate that Provident's decision was arbitrary and capricious. These issues are discussed below.

**A. Medical Evidence**

*8 This past term, in *Black and Decker Disability Plan v. Nord*, --- U.S. ----, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), a unanimous United States Supreme Court held that the ERISA requirement for full and fair consideration of an employee's claim does not include any requirement that the opinions of treating physicians be given controlling weight. While plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," *Nord*, --- U.S. at ----, 123 S.Ct. at 1972, there is no *per se* rule "that plan administrators must accord special deference to the opinions of treating physicians." *Id.* at 1970. Moreover, "nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians' evaluation." *Id.* at 1972.

The ultimate decision to deny benefits was made by Kimberly Swiney, a UnumProvident Customer Care Specialists, who made it clear that she, and not the physician or vocational expert, made the decision. Kimberly Swiney Dep. at 24. In denying Plaintiff's claim for benefits, Provident selectively relied on certain evidence unfavorable to Plaintiff's claim, while ignoring and failing to explain evidence that plainly supports her claim for benefits. As set forth above, the November 7, 2001 letter explaining the denial of benefits cites four reasons primarily relied upon by Provident. *See* Correspondence from Smith to Rosen of 11/7/01. A review of at least two of these reasons raises serious doubts about the objectivity of the decision maker. Equally important, there is substantial information in the record that supports Plaintiff's claim that was apparently ignored by Provident. These considerations lead the Court to conclude that the decision was arbitrary and capricious.

In explaining its decision to deny benefits, Provident notes Dr. Kimmelheim's February 1, 2001 opinion that Plaintiff was not disabled from her occupation, "but that your 'difficulty is with logistics of [your] current job.' " Taken in a vacuum, this might be a reasonable basis for questioning Plaintiff's continued disability. However, even a cursory review of the February 1, 2001 form completed by Dr. Kimmelheim reveals numerous statements suggesting the contrary, including no change in diagnosis, no change in medication, no improvement in Plaintiff's condition, that it was unknown when Plaintiff could return to work; and that Rosen was incapable of sitting for prolonged periods or driving for extended periods of time. While Provident followed up on Dr. Kimmelheim's February 1, 2001 report with additional investigations, it dismisses a subsequent letter sent by Dr. Kimmelheim's on August 29, 2001, where he unequivocally states, "[t]here has been no change in my assessment of [Plaintiff's]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 8

condition" since June 30, 2000. It is worth noting that Dr. Kimmelheim based his assessment on a June 26, 2001 office visit--and represents the most recent evaluation of Plaintiff in the record. After seeing Plaintiff in late June 2001, Dr. Kimmelheim reaffirmed his June 30, 2000 assessment concluding that Plaintiff could not return to her job due to her inability to drive or sit long periods of time, or to work with clients in a fast paced environment. Provident failed to address these conclusions in denying her claim for benefits. Rather, its in-house physician, Dr. Martin, discounted Dr. Kimmelheim's opinion as lacking "objective information" supporting Plaintiff's inability to drive, be around crowds, or sit for prolonged periods of time. Ex. 96 to Plaintiff's Motion. While Provident is not required to "accord special deference to the opinions of treating physicians," it still "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord,* --- U.S. at ----, ----, 123 S.Ct. at 1970, 1972. The Court is of the opinion that the abundance of "objective evidence" otherwise available in the record demonstrates a lack of good reason. In other words, insofar as Defendant relied Dr. Martin's overly narrow assessment of Dr. Kimmelheim's opinion, it was arbitrary and capricious.

*9 The second important factor cited by Defendant is Plaintiff's ability to drive and sit for long periods of time. Provident's letter of November 7, 2001 explains that Plaintiff's occupation did not appear to require her to drive long distances on a daily basis. It then states, somewhat confusingly, that "[t]o the contrary, the job analysis provided by your employer indicates that you may work from your home and/or travel to customers by car." Noting that her occupation generally requires her to drive 30 to 120 minutes in a day, Provident "presumes" that Plaintiff would not be driving 120 minutes to reach her customers on a daily basis. Citing her control over her schedule, it opines she could accommodate her condition "if need be." This explanation ignores evidence in the record raising very serious questions about Plaintiff's ability to drive and/or sit for extended periods of time. Plaintiff herself stated that she experienced pain from driving to the FCE with Mr. Serino, [FN7] and as a result of the examination. She also explained that she was unable to complete the forty minute drive home from the examination. Instead, she drove ten minutes to her mother's house to sleep for several hours in order to recuperate from pain and fatigue. This is corroborated by questions raised by Dr. Kimmelheim, Dr. Martin, and Mr. Serino.

> FN7. Even before going to the FCE, Plaintiff complained to Ms. Swiney that it would difficult to complete the forty minute drive to the testing facility. Plaintiff contends that Ms. Swiney told her that if she did not appear for the examination, her benefits would be immediately discontinued. Of course, if Provident had followed through on this statement, it would clearly constitute an arbitrary and capricious decision. Even taken in the light most favorable to Provident, it at the very least provides some evidence of Provident's adversarial attitude toward Plaintiff.

Plaintiff also disputed Provident's description of her job requirements. Contrary to Provident's presumption that she would not have to drive more than 120 minutes in a day, she noted that she was on a "regular basis" obligated to drive from her home in Ambler, Pennsylvania to client sites as far away as Connecticut. [FN8] As to sitting, Plaintiff noted that even while working at home she was required to sit for "hours at a time" at a computer drafting lengthy documents, and participating in conference calls. Provident fails to explain how Plaintiff might "accommodate" herself with regard to these problems, or to cite reliable record evidence contradicting her statements. These shortcomings support a finding that the determination was arbitrary and capricious.

> FN8. The Court takes judicial notice of the fact that it would take approximately two hours to drive unimpeded from Ambler, Pennsylvania to Connecticut.

Finally, Provident ignored altogether the impact of her work's "fast paced environment." This factor was cited by Plaintiff, Dr. Kimmelheim, as well as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
(Cite as: 2003 WL 22254805 (E.D.Pa.))

Page 9

Dr. Paty, as an obstacle to continuing her occupation in light of Plaintiff's limitations. Yet, Provident never addressed this concern in making its decision. That Plaintiff was approved only for "light" work duty certainly does not give rise to the inference that she could work in a fast paced work environment. In fact, it suggests the opposite. This omission suggests the decision was arbitrary and capricious.

**B. Award of Social Security Benefits**

Contrary to Defendant's contention, Plaintiff's award of SSA benefits was before Provident prior to final resolution of its decision to deny benefits. Plaintiff included the documentation in her August 31, 2001 appeal. However, there is no evidence that Defendant considered the decision or the evidence supporting the decision.

*10 Although a plan administrator is not bound by a Social Security decision, it may be considered as a factor in determining whether the decision was arbitrary and capricious. *See Dorsey v. Provident Life and Acc. Ins. Co.,* 167 F.Supp.2d 846, 856 (E.D.Pa.2001) (Katz, J.); *Wilkerson v. Reliance Standard Life Ins. Co.,* No. 99-4799, 2001 WL 484126, at *1 (E.D.Pa. Mar.6, 2001) (Fullam, J.). In examining Provident's decision under a heightened arbitrary and capricious standard, and in light of the Court's reservations detailed above, it is appropriate to question Provident's failure to address the SSA finding of disability. This omission raises serious questions as to the objectivity of the decision maker, and further suggests that the decision to deny benefits was arbitrary and capricious.

In conclusion, Defendant's decision to deny benefits was arbitrary and capricious. Provident's demonstrated lack of objectivity, and lack of substantial evidence supporting its decision, dictate that the decision cannot withstand judicial scrutiny. Defendants selectively relied on evidence favoring a denial of benefits, inadequately discounted evidence to the contrary, and ignored substantial evidence that would support a finding of disability under the plan documents. Accordingly, summary judgment in Plaintiff's favor is appropriate.

Having granted Plaintiff's Motion for Summary Judgment on the issue of the administrator's denial of benefits, it follows that Defendants' Motion for Summary Judgment on the same issue must be denied.

**UNUMPROVIDENT AS A PROPER PARTY**

Plaintiff seeks to pierce the corporate veil on an alter-ego theory, arguing that UnumProvident so dominates its wholly-owned subsidiary corporation, Provident, that it should be held liable for Plaintiff's benefits. This requires an examination of whether, in light of numerous factors, the parent company exercised "complete domination" of the subsidiary corporate entity as to the challenged transaction. *Eastern Minerals & Chems. Co. v. Mahan,* 225 F.3d 330, 333 n. 7 (3d Cir.2000) (listing factors under Pennsylvania law); *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988) ( "complete domination, not only of finances but of policy and business practice"). The Court concludes that there are significant material issues of fact that cannot be resolved on summary judgment. Accordingly, the Court will deny both motions for summary judgment as to the issue of whether UnumProvident is a proper party. [FN9]

> FN9. Of course, this holding does not relieve UnumProvident's subsidiary, Provident, of its liability to Plaintiff.

**BUY-UP COVERAGE**

Plaintiff contends that she should be paid benefits at the "Buy-Up" rate cap of $7,000.00 per month, rather than the standard maximum rate of $3,000.00 per month. However, at the time Plaintiff enrolled in the Buy-Up option, she was already on disability leave, and she never returned to work. Accordingly, in light of the "Active Work" requirements set forth in the Group Long-Term Disability Insurance Policy, she was not eligible to receive the increased benefits under the Buy-Up option. Defendants contend the premiums were deducted from Plaintiff's paycheck in error, and Plaintiff does not refute this explanation. Plaintiff's reliance on an equitable estoppel theory is unavailing because this case simply does not present the kind of "extraordinary circumstances" required to succeed

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
2003 WL 22254805 (E.D.Pa.)  
**(Cite as: 2003 WL 22254805 (E.D.Pa.))**

Page 10

on such a theory. *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 235 (3d Cir.1994) ("To succeed under [an equitable estoppel] theory of relief, an ERISA plaintiff must establish (1) a material misrepresentation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances."). However, equity demands that the Buy-Up premiums, plus interest, be returned to Plaintiff.

*11 An appropriate Order follows.

### ORDER

**AND NOW,** this 30th day of September, 2003, upon review of the record and the parties' memoranda of law, it is hereby **ORDERED** and **DECREED** as follows:

(1) The Motion for Summary Judgment of Defendants Provident Life and Accident Insurance Company, UnumProvident Corporation, and GE Capital Information and Technology Solutions North America, Inc. [Doc. No. 24] is **DENIED;**

(2) The Motion for Summary Judgment of Plaintiff Janet Rosen [Doc. No. 28] is **GRANTED;**

(3) Judgment is hereby entered in favor of Plaintiff Janet Rosen and against Defendant Provident Life and Accident Insurance Company on all counts;

(4) All claims against Defendant G.E. Capital Information and Technology Solutions North America, Inc. are hereby **DISMISSED WITH PREJUDICE** pursuant to Fed.R.Civ.P. 41(a);

(5) Defendant Provident Life and Accident Insurance Company shall pay Plaintiff Janet Rosen long-term disability benefits retroactively at the rate of sixty percent (60%) of earnings with prejudgment interest at the applicable federal funds rate. Defendant Provident shall refund to Plaintiff the Buy-Up premiums, plus prejudgment interest at the applicable federal funds rate;

(6) Defendant shall reinstate Plaintiff Janet Rosen's long-term disability benefits under policy no. 122806-0002 and pay Plaintiff long-term disability benefits in the future;

(7) Plaintiff is granted leave to file a Petition for the Award of Attorneys' Fees and Costs within fourteen (14) days of the date of this Order.

It is so **ORDERED.**

2003 WL 22254805 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:02CV00591 Docket)  
(Feb. 05, 2002)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 3

"members' of which are private organizations or individuals. The government plays no role in its formal governance.

*Department of Employment*, however, teaches that there is "no simple test" in these matters. The evidence is clear that NASA works closely with NERAC in a variety of ways in carrying out their respective missions. Further, NERAC is similar to the Red Cross in that "[although its operations are financed primarily from . . . private contributions, [it] does receive substantial material assistance from the Federal Government." *Department of Employment*, *supra*, 385 U.S. at 359. Finally, it is of critical importance that NERAC is not a profit-making enterprise like the government contractors held taxable in *New Mexico*. Those contractors were found to be "distinct entities pursuing 'private ends,' and their actions remained 'commercial activities carried on for profit.'" 455 U.S. at 739 (quoting *United States v. Boyd*, 378 U.S. 38, 44 (1964)). NERAC, in contrast, is a nonprofit organization—and, as the evidence shows, *is required to be a nonprofit organization by NASA itself*. In this respect, NERAC is much more clearly an instrumentality of the federal government that was the Second Bank of the United States, found to be a government instrumentality in *McCulloch*, or, for that matter, the Union Pacific Railroad considered in *Peniston*. The contractors at issue in *New Mexico* had no "congruence of professional interests" with the federal government. 455 U.S. at 740. There is such a congruence here.

It is finally appropriate to consider the relationship between NERAC and the federal government "insofar as the activity being taxed is concerned." *New Mexico*, *supra*, 455 U.S. at 735. There are two different activities being taxed here: NERAC's purchases of personal computers, a telephone system, and other equipment, and its subscriptions and royalty fees for private databases. These items will be briefly considered in turn.

As explained above, the "hardware" purchases—the computers, telephones, and other equipment—were, as a result of the contract with NASA, purchased "at the expense of the Government with title vesting within the Government." (Ex. E.) This factor is not itself dispositive, *see New Mexico*, *supra*, 455 U.S. at 734, but combined with the factors already considered, I conclude that in making these purchases, NERAC was an "instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Id.* at 735.

The subscriptions and royalty fees are more problematic. These were subscriptions to and fees for private databases. It is clear, however, that NASA allowed, encouraged, and to some extent guided NERAC in making these subscriptions and paying these fees. NASA's goal is the widest possible dissemination of technological information and the enhancement of the usefulness of its own information, and—again, as a direct result of its relationship with NASA—this was NERAC's very goal in making these subscriptions and paying these fees, NERAC acted as a government instrumentality.

For the reasons stated above, the sales and use taxes in question cannot constitutionally be imposed. Judgment shall enter for the plaintiff.

---

### Jayne A. Kennedy, ADM. v. Oshkosh Truck Corporation et al
Superior Court at Hartford
No. CV920510394S
Memorandum Filed January 20, 1995

**Vendor and Purchaser – Sale of Assets – Liability of Buyer – Buyer Who Utilizes Seller's Goodwill May Be Liable for Products Liability Claims Against Seller.** A manufacturer purchasing the assets of another manufacturer may be liable for product liability claims against the seller asserted after the acquisition if substantially all the assets were purchased and the buyer gained the benefit of the seller's good will by representing its continuing business as a continuation of the seller's discontinued business. The opinion holds that whether the buyer utilized the seller's good will presents an issue of fact which cannot be resolved on a motion for summary judgment. The holding would make it difficult to structure the acquisition of a business in a manner which isolates the buyer from the risk of liability for future claims based on the seller's pre-acquisition activities. The court relied in part on the presence of a common clause specifically including good will as an asset acquired by the buyer, suggesting that the exclusion of good will would help a buyer avoid liability to the seller's former customers.

---

SCHIMELMAN, J. This action arises out of a motor vehicle accident which occurred in the early morning hours of January 18, 1980, on Interstate 84 in East Hartford, Connecticut. The plaintiff, Jayne A. Kennedy, is the administratrix of the Estate of Marla J. Nicoll, the decedent, who was killed when her vehicle collided with a trailer that was parked on the right side shoulder of Interstate 84. On April 16, 1992, the plaintiff began this product liability action against defendant Oshkosh Trucking Corporation dba Oshkosh Trailers ("Oshkosh") and defendant Miller Trailers, Inc. ("Miller"). The plaintiff brings this action against the defendants alleging that the defendants, their agents, servants employees and/or representatives, designed, produced, manufactured, and sold the large trailer which was involved in the accident on January 18, 1980.

Before December 10, 1990, Miller was a Florida corporation with its principal place of business in Bradenton, Florida. Oshkosh is, and at all times rele-

vant herein was, a Wisconsin corporation with its principal place of business in Oshkosh, Wisconsin. Miller manufactured the trailer in question in 1979 and sold the same long before December 10, 1990.

On November 13, 1990, Oshkosh and Miller executed an Asset Purchase Agreement (the "Agreement") whereby Oshkosh on December 10, 1990 agreed to purchase substantially all of Miller's assets. Pursuant to the Agreement, Oshkosh paid $14,889,000 in cash to Miller for its assets. Certain assets of Miller, however, were specifically excluded from the Agreement. The excluded assets were as follows: the consideration given for the asset purchase, Miller's franchise to be a corporation; its articles of incorporation, corporate seal, stock books, minute books and other corporate records; Miller's income tax and franchise returns, and rights to refunds; intercompany accounts receivable in amount not exceeding roughly $5,900,000; any tort claims not reduced to judgment; and any refunds for insurance policies issued to Miller.

In the Agreement, Oshkosh expressly did not assume liability for personal injuries and product liability claims involving products designed and sold by Miller prior to the asset purchase date of December 10, 1990. The Agreement, at Article 2, section 2.01 entitled Excluded Liabilities at part (c), states that Oshkosh will not assume any:

> (c) Liability or obligations [of Miller] for claims made for injury to person or damage to property, whether made in product liability, tort, breach of warranty or otherwise, arising out of or in any way relating to or resulting from any product sold by it [Miller] prior to the closing date.

On August 26, 1994, the defendant Oshkosh moved for summary judgment as to all of the plaintiff's product liability claims as contained in the plaintiff's complaint dated April 7, 1992.

The party seeking summary judgment "has the burden of showing the absence of any genuine issue as to all material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law." *Suarez v. Dickmont Plastic Corp.*, 229 Conn. 99, 105, 639 A.2d 507 (1994). "[A] party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal citations omitted.) *Water & Way Properties v. Colt's Mfg. Co., supra,* 230 Conn. 664. "It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Internal citations omitted.) *Id.,* 665.

In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. *Scrapchansky v. Plainfield*, 226 Conn. 446, 450, 627 A.2d 1329 (1993). The test for the granting of a summary judgment motion is "whether a party would be entitled to a directed verdict on the same facts." *Connell v. Colwell*, 214 Conn. 242, 247, 571 A.2d 116 (1980).

The general rule in most jurisdictions is that "a corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor. . ." *Ricciardello v. J.W. Gant & Co.*, 717 F.Supp. 56, 57-58 (D. Conn. 1989); see also *Copperthite v. Pytlik,* Superior Court, Judicial District of Middlesex, Docket No. 50953, (August, 29, 1992) (Arena, J.). Despite this general rule or a successor corporation's signed refusal to assume the liability of its predecessor, there are, nonetheless, four well-established exceptions to the general rule of non-liability:

> (1) the purchase agreement expressly or impliedly so provides;
>
> (2) there was a merger or consolidation of the two firms;
>
> (3) the purchaser is a "mere continuation" of the seller; or
>
> (4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Ricciardello v. J.W. Gant & Co., supra,* 58; *Copperthite v. Pytlik, supra.*

A fifth exception to the above rule, the product line exception, has been recognized by a small number of states, and, in particular, by a few Connecticut Superior Courts. In Connecticut, the product line exception is generally stated to asses liability "[w]here the successor [corporation] may hold itself out as being the same by name of product, operation and sale, thereby receiving the benefit of past goodwill, it should likewise bear the burden of past operation." *Copperthite v. Pytlik, supra,* quoting *Fletcher v. Doughboy Recreational, Inc.,* 7 Conn. Law. Trib. No.6, p. 16 (Super. Ct., October 20, 1980) (Corrigan, J.). See *Ray v. Alad,* 19 Cal.3d 22. 560 P.2d 3, 136 Cal.Rptr. 574 (1979) (One of first cases to hold successor corporation liable for product liability claim in which one of the court's justification for imposing liability upon a successor to a manufacturer rested on the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business). See also *Santa Maria v. Owens-Illinois. Inc.,* 808 F.2d 848 (lst Cir. 1986).

Application of the product line exception requires the following three factors to be met:

> (1) the transferee must acquire substantially all of the transferor's assets, leaving no more than a corporate shell remaining; (2) the transferee must hold itself out to the public as a continuation of the

transferor, and must do so by producing the same product line under a similar name; and (3) the transferee must benefit from the good will of the transferor.

*Copperthite v. Pytlik, supra.*

In *Copperthite*, the plaintiff brought a products liability action against Peterson Oil, the successor corporation of the manufacturer and installer of a defective home furnace. *Id.* The defendant Peterson Oil bought substantially all of the assets of Higganum Oil Company. *Id.* The defendant Peterson Oil moved for summary judgment and the plaintiff argued in opposition that the court should apply the product line exception. *Id.* In denying the motion for summary judgment the court found that questions of fact existed as to whether Peterson Oil held itself out to be a continuation of Higganum Oil and whether Peterson Oil benefited from the goodwill of Higganum Oil. *Id.*

The defendant, in its memorandum in support of its motion for summary judgment makes a number of arguments as to why the product line exception is not applicable in the present matter. The defendant attempts to remind this court that both the *Copperthite* and *Fletcher* cases were Superior Court decisions and therefore are not binding on this court. Additionally, the defendant urges the court to adopt the majority view by rejecting the product line exception. The defendant also argues in a conclusory fashion that the *Copperthite* case is "easily distinguishable on its facts" from the present case.

The defendant further argues that the three product line requirements are not satisfied in the present case. The defendant asserts that Oshkosh did not acquire all of Miller's total assets; that Oshkosh did not hold itself out to the public as a continuation of Miller; and that Oshkosh has not produced a product line under a similar name. The defendant argues that there are no genuine issues of material fact in dispute and as a matter of law summary judgment should be granted. The defendant concludes its argument of its motion asserting that the general rule of non-liability of a successor corporation should apply in the present case.

The plaintiff argues in her memorandum in opposition that genuine issues of material fact are present in this matter. The plaintiff argues that as to each of the product line exception's three requirements there are issues of fact which are not proper for summary judgment determination.

As to the first requirement of the product line exception, the plaintiff has submitted along with her memorandum in opposition an excerpt of Answers by the Defendant, Miller Trailers to the Plaintiff's First Set of Interrogatories and Requests for Production dated April 15, 1993 [First Set of Interrogatories] in which Miller states that Oshkosh purchased 100% of Miller's total assets pursuant to the Agreement. Additionally, in the First Set of Interrogatories, Miller stated that after the Agreement date of December 10, 1990, Miller ceased to exist as a business entity under the Miller name or any other name.

Against this background it is found find that there are genuine issues of material fact whether or not Oshkosh bought substantially all of Miller's assets and whether after the sale Miller was left as no more than a corporate shell.

The second requirement of the product line exception states that the transferee must hold itself out to the public as a continuation of the transferor and must do so by producing the same product line under a similar name. See *Copperthite, supra.* The plaintiff argues that material facts are in dispute despite the Affidavit of Robert Marino submitted by the defendant in which Marino attests that Oshkosh had no involvement with the trailer in question. The plaintiff asserts, by reference to Oshkosh's Supplemental Responses to Interrogatories and Requests for Production dated August 12, 1993, that Oshkosh purchased Miller's physical plant in Florida and began manufacturing trailers at that site. The plaintiff also asserts that Oshkosh has admitted that subsequent to December 10, 1990 it has conducted inspection, maintenance, and repairs of Miller trailers. The plaintiff also asserts that Oshkosh's Responses to Plaintiff's First Set of Interrogatories and Requests for Production, in which Oshkosh admits that it has provided service to Miller trailers when requested to do so by the owners of the trailer, establish a question of material fact as to whether Oshkosh was holding itself out to the public as a continuation of Miller.

Again, genuine issues of material fact exist as to whether or not the second requirement of the product line exception has been satisfied.

The third requirement of the product line exception requires that the transferee benefit from the goodwill of the transferor. The plaintiff in her argument points out that the Agreement at Article 1, section 1.01(d) specifically states that Oshkosh is purchasing Miller's goodwill. The plaintiff also argues that when Oshkosh provides service to trailers made by Miller it receives the benefit of the goodwill of Miller.

The court finds that genuine issues of material fact are in dispute as to whether or not as a matter of law the third requirement has been met.

After a review of the defendant's motion, the memoranda of law in support of and in opposition to the motion, and the affidavits and exhibits attached thereto, the court denies the defendant Oshkosh's motion for summary judgment as to all of the plaintiff's product liability claims as contained in the complaint dated April 7, 1992.